FORM TO BE USED BY A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

Deondrae L. King                                    COMPLAINT

(Enter above the full name of the plaintiff in this action)

v.                                    Civil Action No. _____

Cumberland County Sheriffs Department        (To be supplied by the Clerk of the Court)

Robert Augustino

                                    RECEIVED

                                    APR 27 2022

(Enter the full name of the defendant of defendants in this action)

                                    AT 8:30_____
                                    WILLIAM T. WALSH     M
                                    CLERK

INSTRUCTIONS; READ CAREFULLY

1.      This complaint must be legibly handwritten or typewritten, signed by
the plaintiff and   subscribed to under penalty of perjury as being true and
correct.  All questions must be answered concisely in the proper space on
the form.  Where more space is needed to answer any question, attach a
separate sheet.

2.      In accordance with Rule 8 of the Federal Rules of Civil Procedure, the
complaint should contain (1) a short and plain statement of the grounds
upon which the court's  jurisdiction depends, (2) a short plain statement of
the claim showing that you are entitled to relief, and (3) a demand for
judgment for the relief which you seek.

3.      You must provide the full name of each defendant or defendants and
where they can be found.

4.      You must send the original and one copy of the complaint to the Clerk
of the District Court.  You must also send one additional copy of the
complaint for each defendant to the Clerk. Do not send the complaint
directly to the defendants.

5.      Upon receipt of a fee of $400.00 (a filing fee of $350.00, and an
administrative fee of     $50.00), your complaint will be filed.  You will be
responsible for service of a separate summons and copy of the complaint on
each defendant.  See Rule 4, Federal Rule of Civil Procedure.

6.     If you cannot prepay the $400.00 fee, you may request permission to proceed in forma pauperis in accordance with the procedures set forth in the application to proceed in forma pauperis. See 28 U.S.C. §1915. (If there is more than one plaintiff, each plaintiff must separately request permission to proceed in forma pauperis.)

7.     If you are given permission to proceed in forma pauperis, the $50.00 Administrative Fee will not be assessed. The Clerk will prepare and issue a copy of the summons for each defendant. The copies of summonses and the copies of the complaint which you have submitted will be forwarded by the Clerk to the United States Marshal, who is responsible for service. The Marshal has USM-285 forms you must complete so that the Marshal can locate and serve each defendant. If the forms are sent to you, you must complete them in full and return the forms to the Marshal.

## QUESTIONS TO BE ANSWERED

1a.   Jurisdiction is asserted pursuant to (CHECK ONE)

     ✓  42 U.S.C. §1983 (applies to state prisoners)

     ____ Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) and 28 U.S.C. § 1331 (applies to federal prisoners)

If you want to assert jurisdiction under different or additional statutes, list these below:

_____

1b.   Indicate whether you are a prisoner or other confined person as follows:

✓ Pretrial detainee

__ Civilly-committed detainee

__ Immigration detainee

__ Convicted and sentenced state prisoner

__ Convicted and sentenced federal prisoner

__ Other: (please explain)_____

2.     Previously Dismissed Federal Civil Actions or Appeals

If you are proceeding in forma pauperis, list each civil action or appeal you have brought in a federal court while you were incarcerated or detained in any facility, that was dismissed as frivolous or malicious, or for failure to state a claim upon which relief may be granted. Please note that a prisoner who has on three or more prior occasions, while detained in any facility, brought an action or appeal in a federal court that was dismissed as frivolous or malicious, or for failure to state a claim upon which relief may be granted, will be denied in forma pauperis status unless that prisoner is under imminent danger of serious physical injury. See 28 U.S.C. § 1915(g).

a.     Parties to previous lawsuit:

Plaintiff(s): _____

_____

Defendant(s): _____

_____

b.     Court and docket number: _____

c.     Grounds for dismissal: ( )   frivolous   ( ) malicious

                           ( )   failure to state a claim upon which relief may be granted

d.     Approximate date of filing lawsuit: _____

e.     Approximate date of disposition: _____

If there is more than one civil action or appeal, describe the additional civil actions or appeals using this same format on separate sheets.

3.     Place of Present Confinement? _____

4.     Parties

(In item (a) below, place your name in the first blank and place your present address in the second blank. Do the same for additional Plaintiffs, if any.)

a.    Name of plaintiff: _Deondrae L. King_____

Address:_____

Inmate#: _56584_____

b.   First defendant:

Name: ~~Robert~~ *Augustino*_____

Official position: *HeaD  Shernff*_____

Place of employment: *Cumberland County Sheriff's Department*

How is this person involved in the case?

(i.e., what are you alleging that this person did or did not do that violated your constitutional rights?)

*I was confined to sleep shackled on a bench in a holding Cell from 12:15 Am  to  7:30 Am approxiamdely.*

_____

_____

c.   Second defendant:

Name:_____

Official position:_____

Place of employment:_____

How is this person involved in the case?

(i.e., what are you alleging that this person did or did not do that violated your constitutional rights?)

_____

_____

_____

_____

d.   If there are more than two defendants, attach a separate sheet. For each defendant specify: (1) name, (2) official position, (3) place of employment, and (4) involvement of the defendant.

5.   I previously have sought informal or formal relief from the appropriate administrative officials regarding the acts complained of in the Statement of Claims on page 6.

____Yes    ✓ No

If your answer is "Yes," briefly describe the steps taken, including how relief was sought, from whom you sought relief, and the results.

_____

_____

_____

_____

If your answer is "No," briefly explain why administrative remedies were not exhausted.

Due to the severe number of civil lawsuits against the county, and lack of staff, my complaints was viewed as "small" or "petty" and pushed to the side.

_____

6.   Statement of Claims

(State here as briefly as possible the facts of your case. Describe how each defendant violated your rights, giving dates and places. If you do not specify how each defendant violated your rights and the date(s) and place of the violations, your complaint may be dismissed. Include also the names of other persons who are involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Use as much space as you need. Attach a separate sheet if necessary.)

On March 23, 2022, I was arrested in Millville and brought to the Millville P.D. I was then transported to Vineland P.D. to address charges there. I was in the Vineland P.D. for over or close to 10 hours handcuffed to a bench. I was then transported to the CCDOC where I was brought in the "Sally-Port" for a Covid-Test and then immediately brought over to the Sheriffs Department —

where I was to reside for the night. I spent from approximately 12:15 am to approximately 7:30 Am or 8Am shackled on a hard bench with no proper way to sanitize the conditions of the holding cell on top of me being shackled.

7.    Relief

(State briefly exactly what you want the Court to do for you. Make no legal arguments. Cite no cases or statutes.)

Provide any and all damages deemed fit by the courts for cruel conditions, health issues, mental conditions, that jeopardized my life as my health in and out of jail, family concerns as far as the spread of Covid-19

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

8.    Do you request a jury or non-jury trial? (Check only one)

(√) Jury Trial ( ) Non-Jury Trial

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _14_ day of _April_ , 20 _22_

_Aleondsae King_

Signature of plaintiff*

(*EACH PLAINTIFF NAMED IN THE COMPLAINT MUST SIGN THE COMPLAINT
HERE. ADD ADDITIONAL LINES IF THERE IS MORE THAN ONE PLAINTIFF.
REMEMBER, EACH PLAINTIFF MUST SIGN THE COMPLAINT).

RECEIVED

APR 27 2022

AT 3:30 ___ M
WILLIAM T. WALSH, CLERK

## Summary

On March 23, 2022, I Deodraeon King was arrested by Milville Police. I was transported from the scene by EMT Ambulance to Inspira Medical Hospital to be treated for a left Knee injury and right ankle injury. I was then transported to Milville PD to be officially charged. I was then transported to Vineland PD to be charged. I was brought in approxiamdely 2:30pm. I sat handcuffed to a bench from 2:30pm to 12AM 3/24/22. I Was then transported by officer De La Rosa to CCDOC. Upon entry into the "sally Port" of CCDOC, I was given a Covid test but then turned away due to the jail being locked down. The Sheriffs walked me to a holding cell in Cumberland County Sheriffs court holding and was told I was to be there till the jail opens up in the Morning. I was in severe pain from the time I was arrested until I was placed in a cell. I was supposed to be given pain medication provided by the Hospital but was repeatedly denied upon my many requests. I slept on a hard bench while I was shackled hand around waist and both my legs. I am suffering from extreme back and leg pain because I wasn't properly treated after the hospital. The next morning, 3/24/22, I had to limp escorted to CCDOC with another Inmate who was in the cell next to me, Steffon Brown. He wasn't tested for Covid the night before like I was and wasn't tested at all the first week and we were housed together in D-Pod in Rm #5021 the duration of Steffon Browns stay. The entire time he was coughing and sneezing. I didn't understand why I was subject to testing almost everyday and sometimes twice in a day and he wasn't called at all for a test. He even went to medical a few times but was never tested. I am mentally and emotionally

- Disturbed by my risk of catching this deadly disease due to family passing away and 2 of my kids catching Covid-19.

In short, the Cumberland County sheriffs department showed negligence by failing to exercise the standard of care that a prudent person would have exercised in a similar situation; and any conduct that falls below the legal standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully ~~~~~~~~~~~~~~ disregardful of others rights.

In short, the CCDOC, when asked about these negligent conditions, the Cumberland County Sheriffs department blames the CCDOC; and the Cumberland ~~County Sheriffs department blames~~ CCDOC blames the Sheriffs department.

Both parties showed indifference by showing a lack of interest in or concern about the situation I was placed in knowing I was discharged from the hospital with a knee injury and ankle injury with back soreness. I repeatedly asked for mediation. I don't know of any human being that would allow another human to be subject to those types of conditions.

# * Summary of Facts *

- On <u>May 20th</u>, <u>2021</u>, I was called to "Ms Kings" office (Social Worker) for a lawyer call in my criminal proceedings. Upon leaving the "<u>C-pod</u>" unit where I'm housed, myself and "Officer Hiles" utilized the same elevator together while casually speaking about general conversation. * <u>This was during the "AM" hours</u> *

- After having my lawyer call with counsel Mr. John Morris esq who represents me in my criminal matters. I returned to the "c-pod" unit, but left some papers and had to return to the social worker ("Ms Kings" office). And again, "Officer Hiles" who works "d-pod" unit (next door to "c-pod") where "new arrivals" are housed/quarantined after entering the facility. Got on the elevator with me directly and this time it was about how he was working all over the building in "multiple areas." * <u>Late "Am" hours</u> *

- "Officer Hiles" also did a break for a "C-pod" officer on our unit on May 20th, 2021, where we again spoke directly while he was at the desk. * <u>see cameras at jail</u> * also, "Officer Hiles" is a "cool officer" who

(#2)

frequents "C-pod" regularly speaking to officers, or assisting inmates the best he can.

- On May 22nd, 2021 I was advised that Officer Hiles tested positive (2 days prior) upon the "d-pod" unit next door to my unit ("C-pod) being placed on "quarratine" as a result of Officer Hiles testing positive.
And any other "new arrivals" being housed in "Hole #3" (open area) where Officers, staff & inmates walk through the jail at. (Possibly exposing others) since there not tested until (5) days after entering the jail, but "quarratined" in a "open dormitory area". As well as also possibly exposing each other!

- "No Contact Tracing" was done to find out who all did "Officer Hiles" come in contact with and testing to further prevent the spread of this "deadly virus".
So myself who had "direct contact" (amoung many others throughoutt the facility) was never tested and quarratined. (Especially since he's on "d-pod" and "C-pod" where I'm housed with (30) other inmates is next door 

* NOTE * "Officer Hiles" endured these negligent Conditions and as a result, this facility more then

"MALICIOUS-LY" CONCEALED OUTBREAK!!

Dear Judge Bumb,

Civil Action No. 20-12655 (RMB)

As a result of the facilities "inability" to "protect inmates", "there officers", along with "myself," from this "Deadly Covid 19 Virus". In conjuction with "Warden Richard T. Smith" and "Asst. Warden Charles Warrens" "lies", as well as "decietfully mulicious actions". Utilized to "Conceal" these "Cruel Conditions" during this "entire Covid 19 Pandemic", ultimately leading up to this last current "OUTBREAK"! (starting: NOV/ Dec. 2020, as I've initially advised - you of.) In which the Warden "swept under the rug" and still exists within the facility today. • • •

"A GREAT OFFICER", "FAMILY MAN," and "FATHER of (4) beautiful children" has died in his sleep after catching this "DEADLY COVID 19 VIRUS" from this facility during that "NOV/ Dec" start of the "OUTBREAK" here at the facility. Where over (60) inmates (20) officers and (2) staff members "tested positive" for this "Deadly Virus". (And at that time "only" 260 inmates wore housed at the facility Overall.)

This data came out in "Dec. of 2020" after the Warden tried to initially not make these facts known until other authorities compelled him to via newspaper and other forma of variou_____

(#2)

Simply put, this officer can "NO LONGER" touch his family or Kiss his children. He was a "GREAT PERSON" who I spoke to throughout the weeks and had contact with consistantly.

*(He worked on "B-Pod," a "Lockup Unit" of the facility where "symptomatic" and "Positive Testing" inmates wore also housed when there was enough room there. As well as moved throughout the facility where this "deadly virus" has been "lurking" for some time now, under these "cruel conditions". I never wanted it to take "This," for those to trully believe the facilities "inability" to "protect me" or there officers. Nor to "highlight" the "true severity" of these conditions. *(By losing the life of another...

So I humbly ask that you please have this "Hearing", where my counsel (Mr. David Simon), Can prove these facts even further. (As you've appointed -him to Im not just "some inmate" trying to get out of jail, but rather is a "Father", "Fiancé" and "Human Being" who doesn't wanna die... (sincerely)

"Officer L. Andujar", did not deserve this and the fact that this "deadly virus" has, "after" "long term effects, makes it even more "scarier." (Even after your exposure has pas

And now with this "New strain'" slowly finding its wa

(#3)

-, that is "70%" more "passable" and "30% more" "deadlier" via the news, as well as early research. And also with this facilities "inability" to protect me from this "deadly virus" since day one of this Pandemic, I'm trully in fear as a "asthmatic", especially of being exposed fatally.

In closing, "Officer L. Andujar", had no "underlining medical issues", nor did he have any "severe issues" at all. He was just "42 yrs. old" and laughed & joked "everytime" you seen him, this is a tragedy!
*(This virus has no boundries)*

I respectfully & patiently hope to hear from you or my counsel, "(Mr. Simon)" soon, because this "officers death" has trully taken a toll on me "dramatically," further increasing my fears during this deadly "Outbreak".

CC. Judge Bumb          *(That is being Maliciously Concealed)*          Respectfully Submitted,

Mr. David Simon Esq.

Mr. Christopher Kinkade Esq.

   (Class Action No. 20-7907 (NLH)(KMW)

Mr. Jodal
Foral
Jr.

*("PLEASE EXCUSE SMALL ERRORS, MATERIALS ARE LIMITED ")*

(#1)

\* <u>Just</u> <u><sup>SOME</sup> Evidence of how the Jail created and allowed these</u>
<u>Unsafe & Unhealthy conditions</u> \*

- <u>The Jail couldve "rehired"</u> many of the officers that
  they made "Transfer to other County Jails & facilities".
  (In 2020,)When they advised them that the jail would
  be "shutting down" by NOV. / DEC. of that year.)
  Many of those "Officers" that wore transfered
  wanted to come back and even tried to, but
  was denied the ability to do so.
  (Upon seeing that the jail had not closed down
  by NOV. / Dec. of 2020 as they wore advised
  by the jail and transfered.)
  These officers only transferred based on being
  advised that they could do so, because the
  jail was "shutting down" (via E-mail)

\* • These officers couldve been allowed to
  work "A.S.A.P", because they already passed
  training and was qualified to work.
  So if the jail was trully trying to correct
  these "unsafe & unhealthy conditions" created
  by the jail through "Short staffing" issues.

- Instead, the jail not only denied those
  officers with the ability to come back (as
  stated) but also made these conditions

(#2)

even more "miserable & unbearable" so more offices can "quit" or "resighn". *CRUEL* (Based on these "Unsafe & Unhealthy Conditions during this "Deadly Covid 19 Pandemic") And rather took the "Bare Minimum Actions" to make it "appear" as if they wore trying to hire "staff" = as well as correct these Cruel conditions during this "PANDEMIC".

• Actions reflecting that "Bare Minimum" Such as;
− Sending out applications seeking to "Hire" new officers but reflecting it would only be up to "6 months" − "1yr". Knowing many people would not even respond to such a "Unsecure Job" and also that by the time there done training, they wont even make it to work, or have that long to, if so. (2021/MId)
− Various other attempts to make it appear that they wore trying to obtain more officers through the state & etc. Knowing that this "Pandemic" has caused "Staff Shortages" in many facilities, as well as jobs ...

• Simply put, the jails intent the entire

(#3)

time as I suffered throughout this entire "Pandemic", (along with "Officers" and other "inmates") was to "Shut this Jail" down. Or they wouldve never coerced and allowed Officers to transfer based on them being advised that the jail would be "shutting down".

Especially in knowing of the "wide spread" Shortage in officers in all jails as a result of the "Pandemic". And also, without trully even having a plan or surety that it would be closing at the time they alleged initially in "2020".

Even moreso, they wouldve allowed those officers back who wore fully equipted to work "immediately" that tried to come back. Who wore transferred only because they wore advised to do so as a option, since the jail was being closed down.

Rather then denying them, and allowing these Unsafe & Unhealthy /cruel conditions to get worst during this entire pandemic. Just to then use it as a reason to support this jail being "shut down" (Based on these Unsafe & Unhealthy conditions), which they wore ultimately Successful at thus far

(#4)

(in Sept. 2021) and <u>ultimately given</u> the ability to do so (via Injunction) as a result.

- In closing, the jails mulicious goal to have this jail "shut down" (by any means) in the "core" of why these conditions became so "<u>cruel</u>","<u>unhealthy</u>" and "<u>unsafe</u>" during this "<u>Deadly Pandemic</u>". And were not only "created," but also not ginuwinely attempted to be corrected. When the jail indeed had the ability to do so and rather instead chose not to. Then rather fabricate under Oath, (before Honorable Judge Noel Hillman) various alleged facts; Retaliate against "Class Action Members" and Officers for "Exposing these conditions". As well as violate and ignore the "courts Orders" to correct such cruel conditions deliberately in "Bad faith".

From: 

**Subject:** Fw: FYI

**Date:** Fri, Apr 16, 2021 1:57 pm

Sent from Yahoo Mail on Android

----- Forwarded Message -----
**From:** "Pollock, Jeffrey M." <JMPollock@foxrothschild.com>
**To:**
**Sent:** Fri, Apr 16, 2021 at 12:21 PM
**Subject:** FYI



Johanan Evans was brought to Cumberland on 2/21 on an aggravated domestic violence charge. Evans tested negative when he entered the facility.
Preexisting conditions – heart attack; heart stents; COPD; Hep C+ ; high BP.
Represented by PD Nathan Perry

Evans was on some meds for psychiatric issues and was self regulating the drugs. He called the sisters repeatedly sounding intoxicated/over medicated.
On or about 2/28 Evans called both sisters complaining of chest pains and shortness of breath. He said he had requested medical but got no response. Tanya called the Jail the next day and asked that they follow-up on the complaints-told them he had chest pains and shortness of breath.
She was told they would check on him.
The next day she called to check up- was told that if Evans was supposed to be seen by medical he would have been but would not give more information.
Evans continuing calling the sisters; said that he had his BP checked and that medical gave him an inhaler. No test. Evans continued to complain to sisters for next week or so about shortness of breath.
Tested positive on 3/14 and was put in isolation. Called Pamela and was gasping for breath. Said he was told he would not be taken to the hospital unless he was in distress.
Told he would be taken to the hospital in morning, but not transported to Inspira Medical Center until 9 at night.
Immediately intubated.
Pamela is the emergency contact, but Inspira refused to give her information- said she had to get it from the Jail. She called and spoke with Kristina Smith who refused to give her any information and said she had to talk to the Warden and would get back to Pamela. She told Pamela to get the information from the hospital, Smith never called Pamela. Pamela spoke with Ms. King at the Jail once, but got no information and no calls from King. No information for 10 days.
The PD got Evans released from detention on 4/1 or 2. Evans died 4/2.

**JEFFREY M. POLLOCK, ESQ.**
Certified by the Supreme Court of New Jersey
As a Civil Trial Lawyer
**Fox Rothschild LLP**



AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
New Jersey

P.O. Box 32159
Newark, NJ 07102

Tel: 973-642-2086
Fax: 973-642-6523

info@aclu-nj.org
www.aclu-nj.org

JEANNE LOCICERO, ESQ.
Legal Director

jlocicero@aclu-nj.org
973-854-1715

VIA E-MAIL

March 16, 2020

Richard Smith, Warden
Cumberland County Jail
54 W. Broad Street
Bridgeton, NJ 08302

### RE: Coronavirus Response Planning

Dear Warden Smith:

The ACLU of New Jersey writes to voice our concern about the spread of the novel coronavirus ("COVID-19") within county correctional facilities. It is our hope that you will consider the ACLU of New Jersey a resource and partner as you develop a response plan that protects the health, safety, and civil liberties of all New Jerseyans.

As you know, people in jails are housed in close quarters and often have significant medical diagnoses and healthcare needs that are greater than the average population. This makes them more vulnerable to infection generally, and even more so during the COVID-19 pandemic. Without proactive measures, people who are confined will have little ability to inform themselves about preventive measures, or to take such measures, should they manage to learn of them.

First and foremost, your facility should take immediate steps to prevent the introduction of COVID-19. We urge you to use the fullest extent of your power to reduce the population of the jail. In anticipation of likely staff shortages due to illness, we also urge you to take all available steps to reduce the population of people detained in the jail, including releasing detainees whenever possible.

We urge you to collaborate with other criminal justice stakeholders, including county prosecutors and public defenders, to consider the release of pretrial and sentenced detainees who will not pose a physical risk to the community. In particular, you and your staff play a critical role in identifying medically fragile, chronically ill, and elderly detainees who face higher risks of death if they contract the virus.

In order to protect the health of people in custody, staff, and the wider community during the COVID-19 pandemic, county jail administrators also need to actively engage with people confined in their facilities. We encourage you and your colleagues across the state to follow protocols for preparedness and to work with the New Jersey Department of Health ("NJDOH") and local public health officials to develop advanced plans to address the virus. Having an

Declaration for Persons in Detention and Detention Staff
COVID-19

Chris Beyrer, MD, MPH
Professor of Epidemiology
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

I, Chris Beyrer, declare as follows:

1.  I am a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health, where I regularly teach courses in the epidemiology of infectious diseases. This coming semester, I am teaching a course on emerging infections. I am a member of the National Academy of Medicine, a former President of the International AIDS Society, and a past winner of the Lowell E. Bellin Award for Excellence in Preventive Medicine and Community Health. I have been active in infectious diseases Epidemiology since completing my training in Preventive Medicine and Public Health at Johns Hopkins in 1992.

2.  I am currently actively at work on the COVID-19 pandemic in the United States. Among other activities I am the Director of the Center for Public Health and Human Rights at Johns Hopkins, which is active in disease prevention and health promotion among vulnerable populations, including prisoners and detainees, in the US, Africa, Asia, and Latin America.

### The nature of COVID-19

3.  The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the WHO. Cases first began appearing sometime between December 1, 2019 and December 31, 2019 in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

4.  On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus which caused the 2002-2003 SARS epidemic.

5.  COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally ·mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

6.  The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.

7.  Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS) which has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical

ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and parts of China.

8. COVID-19 is widespread. Since it first appeared in Hubei Province, China, in late 2019, outbreaks have subsequently occurred in more than 100 countries and all continents, heavily affected countries include Italy, Spain, Iran, South Korea, and increasingly, the US. As of today, March 16th, 2020, there have been 178,508 confirmed human cases globally, 7,055 known deaths, and some 78,000 persons have recovered from the infection. The pandemic has been termed a global health emergency by the WHO. It is not contained and cases are growing exponentially.

9. SARS-nCoV-2 is now known to be fully adapted to human to human spread. This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

10. The U.S. CDC estimates that the reproduction rate of the virus, the $R_0$, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity. This again, is likely a function of all human populations currently being highly susceptible. The attack rate given an exposure is also high, estimated at 20-30% depending on community conditions, but may be as high as 80% in some settings and populations. The incubation period is thought to be 2-14 days, which is why isolation is generally limited to 14 days.

## The risks of COVID-19 in detention facilities

11. COVID-19 poses a serious risk to inmates and workers in detention facilities. Detention Facilities, including jails, prisons, and other closed settings, have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

12. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities from which inmates derive.

13. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible. For example, several deaths were reported in the US in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May, 2019.

14. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities.

15. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure. This has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff.

- **Housing of persons exposed to the virus:** The plan must describe how and where people in the jail system will be housed if they are exposed to the virus, or at high risk of serious illness if they become infected or sick with it. This should not result in prolonged, widespread lock-downs. Any lock-downs or interruptions in regular activities, such as exercise or visits and phone calls with families or attorneys, should be based solely on the best science available and should be as limited as possible in scope and duration.

- **Expanded and No-Cost Calls & Video Visitation:** It is vital for people in detention to remain connected with family and loved ones, especially during a time of significant stress and uncertainty. In the event that the facility has already halted in-person visits, the jail should take immediate steps to provide calls and video visitation at no cost for the duration of the pandemic. The facility should also lift any existing limits on the amount of time people can spend on the phone or video call.

- **Treatment:** Courses of treatment for any individual diagnosed with COVID-19 must be evidence-based, available immediately, and in compliance with scientifically-based public health protocols.

- **Vulnerable Populations:** The plan must provide for additional precautions to prevent infections among those who are at high risk of serious illness if they are infected, such as pregnant women and people with chronic illnesses, geriatric individuals, those with compromised immune systems or disabilities, and people whose housing placements restrict their access to medical care and limit the staff's ability to observe them.

- **Data collection:** The collection of data regarding COVID-19 will be part of the public health response. As with any contagious disease, data collection is critical to understanding and fighting the virus. The county jail system must be part of this process. The same information that is tracked in the community must be tracked in the jails.

We fully recognize that during a disease outbreak individual rights may give way to the greater good and that the health needs of employees must be prioritized as a means of keeping us all safe; however, balance is fundamental, even under the current circumstances. Accordingly, during the ongoing pandemic, we urge you and your staff to prioritize the civil and human rights of people in your custody, alongside the rights of employees.

We deeply appreciate your hard work during this difficult time. Please feel free to contact me if the ACLU of New Jersey can be a resource for you.

Sincerely,

Jeanne LoCicero

Jeanne LoCicero
Legal Director

 *written twice*

## CCDOC INMATE REQUEST FORM

### This Form Must Be Signed and dated by the Area Supervisor Upon Submission

Complete <u>One</u> Form for Each Department / Program / Inquiry

(MARQUE SOLAMEME UN DEPARTMENTO / PROGRAMA / SERVICIO POR FORMULARIO)
**(CIRCLE YOUR CHOICE)**

| **ADMINISTRATION** | **CUSTODY / MAILROOM** | **SIU** | **CLASSIFICATION** | **EDU / SS / RELIGIOUS** | **COMMISSARY** |
|---|---|---|---|---|---|
| Disciplinary Appeals | Housing Unit / Cell Change | Special Housing | Status / Work Assignment | GED / Certificate | Order / Issues |
| Special Visit Request | Legal / Certified Mail | STG / Visit Ban | Open Charges / Detainers | Legal Call / Law Library | Account Balance |
| Reinstate Visits | Property / Property claims | Other: _____ | County Calculation | Paralegal Assist / Supplies | Other: _____ |
| Other: _____ | | | Citizenship | Funeral Trip / Emergency | |
| **MEDICAL / MENTAL HEALTH** | | | Parole / Opt-out Panel Hearing | SSI / SSDI / Release Plans | |
| Emergency / Medication / Medical Release Form | | | Drug Court | MAT / Project PRIDE | |
| Dental / Eye Glasses / Referrals | | | Other: _____ | Drug Court Programs | |
| Co-Pay Issues / Diets – Food Allergies | | | | Religious items / Issues | |

---

**THIS SECTION TO BE COMPLETED BY DETAINEE**

Detainee Name: _Deondrae King_   Booking Number: _54554_   SBI#: _655182c_   Unit: _D-PoD_   Date: _3/28/22_

Request: _I have been asking the unit officers and the shift nurses why I have been getting tested and not my cell mate Stefon Brown. He hasn't been tested since he came in which is subjecting me to Covid-19. He has been coughing and hasn't been tested._

**FOR OFFICIAL USE ONLY – DO NOT WRITE BELOW THIS LINE**

| Received by: | Date: | Dept. Forwarded to: | Date: |
|---|---|---|---|

Staff Response:

| Staff Signature: | Admin Reviewer: |
|---|---|

White and Yellow to Custody  •  Pink to Inmate

Form IRF - 521  rev. 07/21

Case 1:22-cv-02426-NLH-MJS   Document 1   Filed 04/27/22   Page 25 of 29 PageID: 25

3/6/22, 8:57 AM          RAYMOND LAMAR BROWN, JOHN CLARK, DESMOND ROGERS, TODD FORD, JR. and CARLOS SOLER, individually, and on …

WESTLAW

**RAYMOND LAMAR BROWN, JOHN CLARK, DESMOND ROGERS, TODD FORD, JR. and CARLOS SOLER, individually, and on behal...**
United States District Court, D. New Jersey.  ·  March 3, 2022  ·  Slip Copy  ·  2022 WL 621043  *(Approx. 4 pages)*

2022 WL 621043
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

# RAYMOND LAMAR BROWN, JOHN CLARK, DESMOND ROGERS, TODD FORD, JR. and CARLOS SOLER, individually, and on behalf of others similarly situated, Plaintiffs,

v.

EUGENE CALDWELL, in his official capacity as Warden, Cumberland County Department of Corrections, and CUMBERLAND COUNTY, NEW JERSEY, et al.,[1] Defendants.

No. 20-cv-7907 (NLH) (AMD)
|
Filed 03/03/2022

### Attorneys and Law Firms

APPEARANCES:

Karen A. Confoy, Esq., Paul W. Kalish, Esq., Jeffrey M. Pollock, Esq., Fox Rothschild LLP, Princeton Pike Corporate Center, 997 Lenox Drive, Lawrenceville, NJ 08648, Attorneys for Plaintiffs

Gregg L. Zeff, Esq., Law Firm of Gregg L. Zeff, 100 Century Parkway, Suite 305, Mt. Laurel, NJ 08054, Attorneys for County Defendants

John-Paul Madden, Esq., Madden & Madden, 108 Kings Highway East, Suite 200, P.O. Box 210, Haddonfield, NJ 08033-0389, Attorneys for Charles Warren

Michael L. Testa, Esq., Testa Heck Testa & White, PA, 424 Landis Avenue, Vineland, NJ 08360, Attorneys for Loren Joynes

OPINION

NOEL L. HILLMAN, U.S.D.J.

*1 Plaintiffs are proceeding on a First Amended Complaint seeking injunctive relief, individually and on behalf of the class of similarly situated present and future detainees in the Cumberland County Jail ("Jail"), based on the conditions in the Jail as they relate to COVID-19. ECF No. 43.

On January 21, 2022, Plaintiffs filed a motion to supplement the First Amended Complaint. ECF No. 305. Defendants have not filed any opposition to the motion and the time to do so has expired.[2] Therefore, the Court will grant the unopposed motion to supplement the First Amended Complaint.

### I. BACKGROUND

As this matter has a long and procedurally complex history, of which the parties are well aware, the Court will limit its present discussion of the history to the information necessary to resolve the pending motion.

After filing the First Amended Complaint, Plaintiffs filed a motion for preliminary injunction addressing the Jail's failures in COVID-19 testing, protection, and quarantine and isolation procedures. ECF No. 44. The Court conducted an evidentiary hearing on April 20, 21, 22, 26, 27, 29, 30, May 3 and 4, 2021, at which time it heard testimony and took evidence by and on behalf of Plaintiffs and Defendants. On May 6, 2021, the parties agreed to the appointment of a Special Master under Federal Rule of Civil Procedure 53 to make findings and to report and make recommendations to the Court concerning the conditions at the Jail regarding COVID-19. ECF No. 126. The Court subsequently appointed William J. Hughes, Jr., to serve in that capacity. ECF No. 131.

3/6/22, 8:57 AM
Case 1:22-cv-02426-NLH-MJS   Document 1   Filed 04/27/22   Page 26 of 29 PageID: 26
RAYMOND LAMAR BROWN, JOHN CLARK, DESMOND ROGERS, TODD FORD, JR. and CARLOS SOLER, individually, and on ...

In their motion to supplement, Plaintiffs allege that former Jail Warden Charles Warren, Captain Loren Joynes, Sergeant Shane Zanes, and Sergeant Roberto Ortiz (collectively the "Officer Defendants") "coordinated and conducted a 'shakedown' in C-Pod" as retaliation on May 11, 2021. ECF No. 305-1 at 4. Plaintiffs allege corrections officers at the Jail "tossed" the cells in C-Pod and seized inmates' "extra supplies, including rags, cleaning solution, blankets, towels and cot mattresses" that had been kept "with the knowledge, assent, and express or implied permission of correctional officers staffing the unit ...." ECF No. 305-2 at 9. Defendants Joynes and Zanes allegedly took photographs during the shakedown, and Defendant Joynes sent some pictures of C-Pod and the seized items to Defendant Warren via text message. Id. at 10. Plaintiffs allege Defendants Joynes and Warren used their personal cell phones for this communication instead of phones officially issued by Cumberland County. Id.

On May 13, 2021, Plaintiffs wrote to the Court and requested a conference on the matter. ECF No. 128. The Court issued a text order scheduling a conference for May 14, 2021. ECF No. 129. Plaintiffs allege that after County Counsel requested documentation about the shakedown from Defendant Warren, Defendant Joynes texted Defendant Zanes: " 'Type up a report from the C Pod shakedown and put it under my door. The courts want to see our reports. They complained and said w [sic] left them without sheets'." ECF No. 305-2 at 12. In a later exchange, Defendant Zanes asked Defendant Joynes " 'What time did we start,' " to which Defendant Joynes responded " '??' ".[3] Id. Plaintiffs allege that Defendant Zanes backdated his report to May 12, 2021, and incorrectly indicated that the shakedown occurred on May 12, 2021. Id. at 13. Plaintiffs further allege that Defendant Joynes "change[d] date on Defendant Zanes report to May 11 and incident date to May 11. Defendant Joynes print[ed], but [did] not save, the edited report." Id. According to the proposed supplement, Defendant Ortiz " 'created' " a report on May 14, 2021 at 8:11 a.m., which was then sent to Defendant Joynes from a scanner with a Cumberland County domain. Id. Defendant Joynes then sent Defendant Warren an email "containing Defendant Joynes incident report, Defendant Ortiz incident report, Defendant Zanes incident report (with May 11 dates), Martinez and Velez reports, three photos." Id.

*2 The Court conducted evidentiary hearings on May 19 and 20, 2021. The Court issued an Order at the beginning of the hearing "directing that all witnesses in this proceeding be sequestered until such time as their testimony is complete ...." Tr. May 19, 2021 Hearing, ECF No. 140, 7:5-7 ("Sequestration Order"). Defendant Joynes appeared as a witness and represented through separate counsel that he understood the Sequestration Order. Id. 11:9-11. Plaintiffs allege that "[w]ithin an hour of the commencement of the hearing, Defendants Warren and Joynes began text messaging on their personal cellphones about the Plaintiffs' testimony, the testimony of Defendant Ortiz and other witnesses who were involved in the shakedown, the evidence, the Plaintiffs' attorney's areas of questioning, and rulings by the [Court]." ECF No. 305-2 at 14.

## II. STANDARD OF REVIEW

Motions to amend a complaint are governed by Federal Rule of Civil Procedure 15(a). That rule provides that once a party has filed a responsive pleading to the complaint "a party may amend its pleadings only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Leave to amend is to be freely granted unless there is a reason for denial. "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962); see also Arthur v. Maersk, 434 F.3d 196, 204 (3d. Cir. 2006) ("Among the factors that may justify denial of leave to amend are undue delay, bad faith, and futility.").

## III. DISCUSSION

"On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Plaintiffs now move to supplement the First Amended Complaint to include claims against the individual Officer Defendants for retaliation and civil conspiracy under 42 U.S.C. § 1985. ECF No. 305.

The Court concludes that there are no concerns that would prevent amendment. Plaintiffs have not unduly delayed in filing this request, nor is there any indication of bad faith or

dilatory motive on their part. Neither the County Defendants nor the proposed Officer Defendants have filed opposition to the amendment.[4] Regardless, the Court notes that an objection based on prejudice to any defendant would be meritless as it has been known for quite some time that Plaintiffs were considering adding these claims. Discovery regarding the shakedown and its aftermath are ongoing before this Court, and counsel for Defendant Warren and Defendant Joynes have been active participants in that process.

The Court also concludes supplementing the First Amended Complaint would not be futile. The futility of a proposed amended pleading is evaluated under the same standard of legal sufficiency as a motion to dismiss under Rule 12(b)(6). Travelers Indent. Co. v. Dammann & Co., 594 F.3d 238, 243 (3d Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

"A prisoner alleging retaliation must show (1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (internal quotation marks and citations omitted). Accepting the facts alleged in the proposed supplement as true, this Court could reasonably infer that the Officer Defendants retaliated against Plaintiffs for participating in this civil action through the shakedown of C-Pod on May 11, 2021.

*3 The Court could also make a reasonable inference from the alleged facts that the Officer Defendants conspired together to deter Plaintiffs from participating and testifying in this action, or to injure them for having attended or testified before this Court. See 42 U.S.C. § 1985(2). Accordingly, the Court will grant the motion to supplement the First Amended Complaint.

IV. CONCLUSION
The Court will grant the unopposed motion to supplement the First Amended Complaint. An appropriate order follows.

**All Citations**

Slip Copy, 2022 WL 621043

**Footnotes**

1          Defendant Charles Warren resigned from his position as the Warden of the Cumberland County Jail on September 20, 2021. ECF No. 205. The Court will direct the Clerk to substitute current Warden Eugene Caldwell for the claims against Defendant Warren in his official capacity only. Fed. R. Civ. P. 25(d).

2          Under the Clerk's schedule issued pursuant to L. Civ. R. 78.1(a), oppositions were due on February 8, 2022 for motions returnable on February 22, 2022. At the hearing on January 31, 2022, the Court granted Defendants' oral request for a ten-day extension, which made their opposition due February 18, 2022. No opposition or request for a further extension has been submitted.

3          "The 'person shrugging emoji' can designate ignorance, indifference, self-acceptance, passive-aggression, annoyance, giving up, or not knowing what to make of something. It could also be a visual form of the one-word response of indifference, 'whatever.' " Person Shrugging Emoji, Dictionary.com, https://www.dictionary.com/e/emoji/person-shrugging-emoji (last visited Feb. 22, 2022).

4          Defendant Warren and Defendant Joynes have obtained separate counsel. ECF Nos. 244, 254.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext. © 2022 Thomson Reuters

THOMSON REUTERS
Thomson Reuters is not providing legal advice




## CUMBERLAND COUNTY JAIL
# MEDICAL DEPARTMENT REQUEST FORM

**Please print**

_Deandrea Diaz_                                      _56554_
_____Name_____                             _____ID#_____

[ ] [ ]                      _____         _____
Date of Birth                    Housing Unit              Today's Date

Check Request:  ☑MEDICAL        ☐DENTAL            ☐MENTAL HEALTH

Reason for the request:

_____

_____

_____

_____

### I CONSENT TO BE TREATED BY THE STAFF FOR THE CONDITION(S) DESCRIBED.

1. I understand that my requesting health services may result in having my account charged for health care services requested.
2. I understand that I may be charged a $5.00 fee for any visit to health care staff.
3. I understand that I will be charged a $1.00 fee for each OTC medication and a $5.00 fee for each prescription medication for each medication I receive.
4. If I disagree with any charged assessed, I understand that I may file a grievance.

*NO INMATE WILL BE DENIED NECESSARY MEDICL SERVICES DUE TO AN INABILITY TO PAY.*

_____                           _____
Signature                                            Date

## DO NOT WRITE BELOW THIS LINE

_____       _____       _____
Date & Time request received          *Triaged by:*                Date & Time

☐ **24 HR Face to Face**                *24HR Face to*    ☐Non Symptom Sick Call Request
**Visit Completed on:** _____   *Face Disposition:*  ☐Symptom Based Sick Call Request

Referred to:  ☐Nurse Sick call   ☐Mental Health   ☐Dental   ☐Provider Clinic   ☐ICN

**Priority Status**
☐Emergent                                                _____
☐Priority                                                    1. Previous visit on
☐Routine
              _____   _____   _____
              Inmate/Detainee seen on:   Inmate/Detainee seen by:   2. Previous visit on

**(S)ubjective** _____

**(O)bjective** ___ BP: ___ PULSE: ___ TEMP: ___ RESP: ___ O2 STAT: ___ WEIGHT: ___

*Assessment of affected body system:* _____

**(A)ssessment** _____

**(P)lan**  ☐Inmate education reviewed with and given to patient

Referred to   ☐Nurse Sick call   ☐Mental Health   ☐Dental   ☐Provider Clinic   ☐ICN
              _____                        _____   _____
              *(indicate date  to be seen)*            *(indicate date  to be seen)*   *(indicate date  to be seen)*

_____       _____       _____
RN Signature                        Date                 Time